FILED

02/22/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 10, 2024 Session

## STATE OF TENNESSEE v. RALPH EDWARD OVERSTREET, JR.

**Appeal from the Criminal Court for Smith County**
**No. 20-CR-197      Brody N. Kane, Judge**

_____

**No. M2023-00260-CCA-R3-CD**

_____

The Smith County Grand Jury indicted Defendant, Ralph Edward Overstreet, Jr., for burglary, attempted first degree murder, aggravated assault, and resisting arrest. A jury convicted Defendant as charged, and the trial court merged the aggravated assault conviction into the attempted first degree murder conviction. Defendant argues on appeal that: (1) the prosecutor's previous representation of Defendant created an actual conflict of interest that required disqualification and a new trial; (2) the State violated its discovery obligations by introducing evidence that the State allegedly did not disclose of a prior domestic incident between Defendant and his girlfriend; and (3) the evidence was insufficient to support his conviction for attempted first degree murder. Defendant does not challenge the sufficiency of any other conviction. After hearing oral arguments and reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JILL BARTEE AYERS, JJ., joined.

Jessica F. Butler (on appeal), Assistant Public Defender – Appellate Division, Franklin, Tennessee; Shelley Thompson Gardner, District Public Defender; and Brittany Davis Deatherage (at trial) and Kelly A. Skeen (at trial and sentencing), Assistant Public Defenders, Lebanon, Tennessee, for the appellant, Ralph Edward Overstreet, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Jason L. Lawson, District Attorney General; and Jack A. Bare (at trial) and William A. Calla (at trial and sentencing), Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Facts and Procedural History

### Trial Testimony

Ms. Kim Harris worked as a dispatcher for the Carthage Police Department ("CPD") in the early morning hours of June 11, 2020. At one point while she was working, Ms. Harris heard Defendant shaking the door of Carthage City Hall, in which CPD headquarters was housed. Ms. Harris told Defendant that she could not let him in. Defendant walked to one of the building's side doors and "punched" buttons on the keypad in an attempt to unlock the door. This effort proved unfruitful, and Defendant returned to the door he initially tried to enter. Defendant picked up a cigarette receptacle by the door and slammed it against a window next to the door. Ms. Harris heard "three booms and then glass shatter." Ms. Harris was "pretty scared" when she heard the shatter. She sent a dispatch on the police radio to summon assistance.

After Defendant shattered the glass, Ms. Harris saw him "poke[] his head through the window." Defendant began to "put his leg" through the window to enter the building. Ms. Harris instructed Defendant not to come into the building, and he "backed out." Defendant yelled he "want[ed] a bag," to which Ms. Harris replied she did not know what he was talking about.

Smith County Sheriff's Office ("SCSO") Deputy Glen Reece was on patrol that night when he heard something unusual on his radio. Deputy Reece called the SCSO dispatch office, and the dispatcher told him that a window had been knocked out at Carthage City Hall. Deputy Reece drove to City Hall, which he estimated took less than a minute. There he saw Defendant, who walked over to Deputy Reece's vehicle. Deputy Reece instructed Defendant to step back, and Deputy Reece got out of his vehicle. Defendant told Deputy Reece that he was "trying to get his meds" and that "that b*tch in there has my medicine." Defendant appeared "very distraught or almost angry, but not exactly." Defendant repeatedly stated that he was "trying to get his meds."

While Deputy Reece spoke with Defendant, CPD Officers Stephen Enoch and Jason Maynard arrived at the scene. Officer Enoch approached Defendant, whom he knew as "Tater," and told him to get his hands out of his pockets and put them behind his back. Defendant did not comply after Officer Enoch repeated this command multiple times. Officer Enoch testified at trial that it concerned him "very much" that Defendant kept his hands in his pockets. Officer Enoch grabbed Defendant from behind and wrestled him onto the hood of his patrol vehicle in an attempt to place Defendant in handcuffs. Deputy

Reece tried to help Officer Enoch subdue Defendant, but they were unsuccessful because of Defendant's strength. Officer Enoch realized that his hand had been cut by Defendant and "ca[ught] a vision of a knife coming around towards . . . [his] right side." Defendant told Officer Enoch, "I told you, [m]otherf***er, I'd kill you."

Officer Enoch yelled that Defendant had a knife and the officers backed away from him. Deputy Reece drew his weapon. Deputy Reece had not known that Defendant had a knife until he "got into the headlights of the car." Defendant asked the officers to shoot him. At that point, Deputy Reece realized that Officer Enoch was bleeding. Deputy Reece thought at first that he was bleeding because he felt something "warm and wet" on his arm, but then realized that Officer Enoch was "squirting blood all over [Deputy Reece's] arm." Officer Enoch told Deputy Reece that Defendant had cut him. Officer Enoch recalled at trial that he was afraid he would "bleed[] out."

Officer Maynard attempted to tase Defendant, but Defendant pulled out the probes "like it was nothing." Deputy Reece holstered his weapon and tased Defendant. Defendant fell to the ground and Deputy Reece saw something "fly by [his] boot," which he recognized as Defendant's knife. Defendant got back up and Deputy Reece attempted unsuccessfully to tase him again. Deputy Reece loaded a new taser cartridge, but Defendant sat on the ground and put his hands behind his back. Deputy Reece recalled at trial that Defendant had "given himself up."

Another officer handcuffed Defendant, and Deputy Reece went to Officer Enoch, who asked him to summon an ambulance. Deputy Reece described Officer Enoch's injuries as "severe." The officers placed a tourniquet on his arm to slow the bleeding. Due to the severity of Officer Enoch's injuries, another officer drove him to the hospital in a patrol vehicle before an ambulance could arrive.

Several officers picked up Defendant and placed him into a patrol vehicle for transportation to the jail. Videos from surveillance cameras and Officer Enoch's body camera, which documented all of the above events, were admitted as exhibits at trial.

Tennessee Bureau of Investigation ("TBI") Special Agent Charlie Belote arrived at the scene after Defendant had been taken to jail. Deputy Reece collected Defendant's knife in a plastic bag and gave it to Special Agent Belote. Special Agent Belote took several photographs of the scene that were admitted as exhibits at trial.

Officer Enoch's injuries required two surgeries, and Officer Enoch had not regained complete function of his right hand by the time of trial. Officer Enoch did not realize until he was at the hospital that Defendant had also stabbed him in his right side about "four inches below [his] armpit."

- 3 -

Special Agent Belote interviewed Defendant four days after the incident. Ten audio clips from the interview were admitted as exhibits at trial.[1] After waiving his *Miranda* rights, Defendant initially told Special Agent Belote that he did not remember anything about the incident, but he divulged more details as the interview progressed. Defendant said that "people in the back" had told him that he had stabbed Officer Enoch. Defendant said, "I don't see how me stabbing somebody in the hand is me trying to kill them," and, "Come on, now, if I was trying to kill somebody, I'd do more than try to stab him in the hand." Special Agent Belote told Defendant that Officer Enoch had undergone two surgeries since the incident.

Defendant told Special Agent Belote that he always carried a pocketknife and kept another fixed-blade knife in his truck. Special Agent Belote asked Defendant about his girlfriend. Defendant said that she lived in Georgia and that they had gotten into an argument the day before the incident. Though not reflected in the audio clips, Special Agent Belote testified at trial that Defendant told him that he "blacked [his girlfriend's] eye" at one point. Counsel for Defendant objected to this testimony at trial and the trial court issued a curative instruction that the jury should disregard that testimony.

Defendant admitted at one point during the interview that he was "probably guilty" of his crimes, but he wanted the agent to "see where [he was] coming from." Defendant said, "It ain't like I shot my gun intentionally." Defendant told Special Agent Belote, "more than likely, it was probably me trying to get rid of myself. Suicide by cop." Defendant claimed that he did not remember anything about the incident except getting "throwed in the . . . car."

Forensic analysis revealed that Officer Enoch's DNA was found in a blood stain on the knife blade, and Defendant's and Officer Enoch's DNA were found on the knife's handle.

Defendant elected not to testify after a *Momon* colloquy.

Dr. Ron Nieberding testified for the defense as an expert in psychology. Dr. Nieberding evaluated Defendant over the telephone and diagnosed him with "a schizo-[a]ffective disorder." Dr. Nieberding concluded based on his evaluation that Defendant was competent to stand trial, but opined that Defendant was not capable of forming premeditative intent at the time of his altercation with Officer Enoch. Dr. Nieberding

---

[1] The record indicates that the audio clips played at trial were trimmed from a video recording of the full interview between Defendant and Special Agent Belote. The State asserts that it provided the full interview to the defense during discovery, and defense counsel acknowledged at trial having received the full recording. The full interview is not in the record before us.

testified that he believed Defendant merely "reacted to a situation." Dr. Nieberding admitted on cross-examination that he had not reviewed any of the surveillance footage or Officer Enoch's body camera footage.

The jury convicted Defendant as charged in the indictment.

*Sentencing*

During the first setting of the sentencing hearing, counsel for Defendant learned that Assistant District Attorney General ("ADA") Jack Bare, who was the State's lead counsel at trial, had represented Defendant on prior charges.[2] The State sought in part to use convictions on which ADA Bare had represented Defendant to enhance Defendant's sentence in the present case. The trial court continued the hearing upon defense request.

The hearing resumed two weeks later with another prosecutor handling the case. Defense counsel requested that the trial court grant a mistrial, arguing that ADA Bare's previous representation of Defendant created an actual conflict of interest. Defense counsel noted that ADA Bare had represented Defendant on an aggravated assault charge in 2008 and told the trial court that the fact patterns were "very similar." Defense counsel further requested that the entire District Attorney General's Office be barred from handling this case.

The State opposed defense counsel's requests. The new prosecutor, who sat second chair at trial in this case, told the trial court that ADA Bare "ha[d] not spoke[n] to him one bit about his prior representation of [Defendant]." The prosecutor stated that he "kn[e]w nothing about those convictions or any of [Defendant's] convictions, other than what those convictions are."

The trial court denied both of Defendant's requests. As to the conflict of interest, the trial court stated that Defendant knew about ADA Bare's previous representation to the same extent as ADA Bare and could have mentioned it to his counsel. The trial court further noted that Defendant did not testify at trial and none of his previous convictions were discussed at trial, so ADA Bare could not have used any knowledge gained from his previous representation to Defendant's detriment. The trial court stated that it could not find any way Defendant was prejudiced by ADA Bare's previous representation. As to disqualifying the District Attorney General's Office, the trial court denied this request because ADA Bare had not shared any information gained from his prior representation with the other prosecutor. The trial court noted that it did not believe "that the

---

[2] Judgment forms in the record show that ADA Bare represented Defendant on two prior cases: convictions for aggravated assault and simple possession of a Schedule II substance, both from 2008.

- 5 -

circumstances of the prior convictions really have any bearing.  The convictions are what the convictions are."

The trial court told the parties that it would start the sentencing hearing "from scratch," and that it would disregard its notes from the hearing's previous setting in which ADA Bare had participated.  After hearing the proof and arguments from counsel and weighing the relevant considerations, the trial court ordered an effective sentence of 41 years' incarceration.

Defendant appeals.

## *Analysis*

### *Conflict of Interest*

Defendant argues that ADA Bare's previous representation of Defendant created an actual conflict of interest, and the trial court erred by failing to disqualify him and failing to grant a new trial on this basis.  The State disagrees, arguing that ADA Bare did not represent Defendant in this case or use any confidential information against Defendant.  For the following reasons, we agree with the State.

We review a trial court's decision as to disqualification for abuse of discretion.  *State v. Orrick*, 592 S.W.3d 877, 882 (Tenn. Crim. App. 2018).  "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party."  *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

When a trial court faces a motion to disqualify a prosecutor, the trial court must first consider whether the circumstances of the defendant's case establish an actual conflict of interest that requires disqualification.  *State v. Coulter*, 67 S.W.3d 3, 29 (Tenn. Crim. App. 2001) (citing *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000), *superseded by State v. Eady*, No. M2021-00388-SC-R11-CD, ___ S.W.3d ____, 2024 WL 442279, at *11-12 (Tenn. Feb. 6, 2024)), *abrogated on other grounds by State v. Jackson*, 173 S.W.3d 401 (Tenn. 2005).  An actual conflict of interest "includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'"  *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (quoting *Culbreath*, 30 S.W.3d at 312-13).

As relevant here, Rule of Professional Conduct 1.11 subjects prosecutors to the same guidelines as other lawyers regarding conflicts of interest with former clients as set forth in Rule 1.9.  Tenn. Sup. Ct. R. 8, RPC 1.11(d)(1); *see also id.* 1.9.  Additionally, "a

lawyer serving as a public officer or employee . . . shall not . . . participate in a matter in which the lawyer participated personally and substantially while in private practice" absent informed consent. *Id.* 1.11(d)(2)(i). Rule 1.9 states in relevant part that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter" materially adverse to the former client's interests absent informed consent. *Id.* 1.9(a).

Our supreme court very recently considered an identical issue in a case cited by Defendant. In *State v. Eady*, No. M2021-00388-SC-R11-CD, ___ S.W.3d ____, 2024 WL 442279, at *11-12 (Tenn. Feb. 6, 2024), the court held that no actual conflict of interest existed where the elected district attorney general represented the defendant on a 1989 conviction that was later used in 2017 to establish the defendant as a repeat violent offender. The court noted that there was no dispute as to the 1989 conviction, and it "had no bearing" on the convictions at issue. *Id.* at *11. Additionally, there was no substantial risk of disclosure of confidential information: "[t]he only information of import for purposes of the present case was the simple fact of conviction in the 1989 case, which was public record and, therefore, not confidential." *Id.* As such, the matters were not "substantially related" for purposes of RPC 1.9. *Id.*

We conclude that ADA Bare's previous representation of Defendant did not require disqualification here. ADA Bare did not "switch[] teams after learning the signals" here. *Clinard v. Blackwood*, 46 S.W.3d 177, 188 (Tenn. 2001), *abrogation recognized by Eady*, ___ S.W.3d ____, 2024 WL 442279, at *12; *State v. Dixon*, No. M2010-02382-CCA-R3-CD, 2012 WL 2356523, at *14 (Tenn. Crim. App. June 21, 2012), *perm. app. denied* (Tenn. Nov. 26, 2012). Rather, ADA Bare represented Defendant on completely unrelated cases more than a decade before this matter came to trial. Nor were the matters on which ADA Bare represented Defendant "substantially related" to his prosecution in this case, despite Defendant's assertions. That ADA Bare previously represented Defendant on an aggravated assault conviction and Defendant was charged with aggravated assault here does not mean that the matters are substantially related. As the trial court pointed out, ADA Bare did not disclose any confidential information he received from representing Defendant, and because Defendant did not testify, there was no way to use any confidential information against him. The only information used against Defendant was public record: the convictions themselves, with ADA Bare's name listed on the judgment forms. *See Eady*, ___ S.W.3d at ___, 2024 WL 442279, at *11. Defendant asks that we infer that he was prejudiced by ADA Bare's prosecuting him. We decline to make such an inference here. The trial court did not abuse its discretion in denying Defendant's requests to disqualify ADA Bare and grant a new trial on this basis. Defendant is not entitled to relief on this issue.

*Discovery Violation and Remedy*

Defendant contends that the State violated its discovery obligations under Tennessee Rule of Criminal Procedure 16 by failing to turn over Defendant's statement to Special Agent Belote that he "blacked [his girlfriend's] eye." Defendant also asserts that the trial court's curative instruction was insufficient. The State counters that it did not violate its discovery obligations and that the trial court's curative instruction was sufficient. We find that this issue is waived for Defendant's failure to prepare an adequate record, and in any event, the trial court's instruction was sufficient.

On defense request, the State must disclose the defendant's oral, written, or recorded statements under specific parameters. Tenn. R. Crim. P. 16(a)(1)(A), (B). If the State fails to comply with Rule 16, the trial court has several options, including ordering disclosure, continuing the case, excluding the evidence, or fashioning another just remedy. *Id.* (d)(2). Trial courts thus have significant discretion in charting a course when a discovery violation occurs. *See State v. Downey*, 259 S.W.3d 723, 737 (Tenn. 2008).

Whether the State violated its discovery obligations here hinges on whether Defendant's mention of "black[ing] [his girlfriend's] eye" is contained in the full recording of his interview that defense counsel acknowledged the State disclosed. This recording, however, is not present in the record before us. It is therefore impossible for us to determine whether the full recording of Defendant's interview contains any mention of the altercation with his girlfriend. Any attempt to do so would be pure speculation on our part. As the appellant, it was Defendant's burden to prepare an adequate record for resolution of the issues. *See State v. Rimmer*, 623 S.W.3d 235, 296 (Tenn. 2021) (citing *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993)) (appendix). "In the absence of an adequate record, this [C]ourt must presume that the trial court's ruling was correct." *Rimmer*, 623 S.W.3d at 296 (citing *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993) and *State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993)) (appendix). This issue is waived for our consideration.

Even assuming that the State violated its discovery obligations, the trial court's exclusion of the evidence and curative instruction was a sufficient remedy and alleviated the effects of any error. Exclusion of the evidence was a drastic remedy in itself, *see State v. Gann*, 251 S.W.3d 446, 457 (Tenn. Crim. App. 2007) (quoting *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995)), and jurors are presumed to follow the trial court's instructions, *see State v. Reid*, 164 S.W.3d 286, 323 (Tenn. 2005). Defendant has demonstrated no unfair prejudice that resulted from this testimony despite the curative instruction, instead asking this Court to infer prejudice. The trial court did not abuse its discretion in striking the evidence and issuing a curative instruction, and Defendant is not entitled to relief on this issue.

Defendant argues that the evidence is insufficient to support his conviction for attempted first degree murder because the proof did not establish that Defendant acted intentionally or with premeditation. Defendant does not challenge the sufficiency of any other conviction. The State argues that the evidence was sufficient. We agree with the State.

When examining whether the evidence presented at trial was sufficient to support a conviction, several well-settled principles guide our analysis. We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled on appeal to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). These principles guide us "'whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was charged here with attempted first degree murder. First degree murder is in relevant part "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Tennessee Code Annotated section 39-13-202(d) (2020) defines premeditation as:

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The State must prove premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992), *overruled on other grounds by State v. Reynolds*, 635 S.W.3d 893, 917 (Tenn. 2021). The existence of premeditation is a question of fact for the jury and may be inferred from circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Such circumstances may include the use of a deadly weapon on an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, threats or declarations of an intent to kill, a lack of provocation by the victim, failure to aid or assist the victim, the procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013).

As relevant here, a defendant commits criminal attempt when he, acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b)  Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

T.C.A. § 39-12-101.

Defendant essentially asks that we reweigh the evidence in a light more favorable to him.  Defendant characterizes Dr. Nieberding's testimony that Defendant could not form premeditation or intent as "unrefuted," and claims that Defendant was clearly in the throes of a mental health episode.  We remind Defendant that it is the jury's prerogative to weigh the witness' credibility, not ours.  *See Pruett*, 788 S.W.2d at 561.  As such, the jury was free to afford the evidence the weight it saw fit, even fully discounting evidence it did not believe was credible.  We decline Defendant's invitation to reweigh the evidence here.

The evidence here, in the light most favorable to the State, shows that Defendant kept his hand in his pocket when Officer Enoch told him to remove his hand from his pocket.  When Officer Enoch grabbed Defendant in an attempt to handcuff him, Defendant resisted, cutting Officer Enoch's hand very badly and stabbing him in his right side.  Defendant told Officer Enoch during their struggle, "I told you, [m]otherf***er, I'd kill you."  Officer Enoch lost a significant amount of blood, to the extent that the officers did not wait for the ambulance for fear that Officer Enoch would bleed out.  We conclude that this evidence is sufficient to support premeditation and intent, and therefore sufficient to support Defendant's conviction for attempted first degree murder.  Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE

- 11 -